# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

**v.**                                  **CASE NO. 3:16cr17-MCR**

**LARRY L. MASINO,**
**DIXIE L. MASINO.**

     **Defendants.**

_____/

## PRELIMINARY ORDER OF FORFEITURE

Before the Court is the Government's Motion for Issuance of a Preliminary Order of Forfeiture, ECF No. 189, and Motion for Issuance of Forfeiture Money Judgment in the amount of $5,813,584.00, ECF No. 190, following guilty verdicts for the Defendants' operation of an illegal gambling business, *see* 18 U.S.C. § 1955, and for engaging in money laundering activities, *see* 18 U.S.C. §§ 1956(h), 1957. The Court held an evidentiary hearing on the motions, and the parties submitted their closing arguments in writing, *see* ECF Nos. 200, 209, 210. Having fully considered the record and the parties' arguments, the Court finds that the motions are due to be granted.

**Background**

Defendants Larry and Dixie Masino ("the Masinos") were indicted, tried by a jury, and found guilty on forty-one federal charges stemming from the operation of an illegal gambling (bingo) business in Fort Walton Beach, Florida. The evidence at trial showed that the Masinos, through their ownership, management, and supervision of an entity known as Racetrack Bingo, Inc., operated an illegal gambling business. Specifically, the Masinos used Racetrack Bingo and paid employees to "conduct bingo games" without returning all proceeds of the games to the players, as required of a noncharitable organization conducting bingo under Florida law. Instead of returning all proceeds to the players as prizes, as the law required, the Masinos concocted a scheme whereby charities would sponsor the games and pay Racetrack Bingo a very high "lease" payment to conduct the games in its building. In this way, Racetrack Bingo made it appear that the charities were conducting the games, while routing large amounts of bingo proceeds to Racetrack Bingo as "lease" payments and ultimately to themselves personally through salaries and profit distribution payments from Racetrack Bingo. Essentially, the Defendants were unlawfully sharing bingo proceeds with the charities.[1] *See* ECF No. 182.

---

[1] Under Florida law, persons conducting bingo may not be paid; noncharitable organizations conducting bingo must return all proceeds to players as prizes and may not deduct

CASE NO. 3:16cr17-MCR

In ruling on post-trial motions, the Court found that the evidence supported the jury verdicts for violation of the Illegal Gambling Business Act ("IGBA") (Count Two); conspiracy to commit money laundering (Count Three); and numerous substantive money laundering charges based on the Masinos' deposits of profit distribution checks from Racetrack Bingo into their personal accounts (Counts Four through Twenty-One against Larry Masino and Counts Twenty-two through Forty-One against Dixie Masino). However, the Court entered a judgment of acquittal on the wire fraud conspiracy charge (Count One), finding the evidence insufficient to establish an intent to defraud the charities. The facts are set out in great detail in the Court's prior order, ECF No. 182, and incorporated here by reference.[2]

_____

expenses; charities conducting bingo may deduct expenses incurred in conducting bingo but may not sponsor another to conduct bingo for them; and lease payments may not exceed the rental rates charged for similar premises in the same locale. *See* Fla. Stat. § 49.0931.

[2] The Court found that, although a jury question existed as to the Masinos' intent to deceive the charities, there was no evidence of an intent to *harm* the charities by depriving them of property or money, as necessary to sustain the wire fraud conspiracy charge. ECF No. 182; *see United States v. Takhalov*, 827 F.3d 1307, 1312-13 (11th Cir.), *opinion modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016). The record was insufficient to show the requisite intent to harm because of how the business was run—the charities essentially agreed to sponsor the bingo games but had no financial investment and no involvement in conducting the games. The charities benefitted greatly, receiving what charity representatives characterized as "free money" in the form of bingo proceeds after the deduction of expenses, including the " turnkey lease" payments to Racetrack Bingo. The lease allowed Racetrack Bingo to take an exorbitant "turnkey" lease fee off the top of the bingo proceeds (approximately $84,000 per month) not only for rent but also for operating the games, which Racetrack Bingo accomplished with its own paid employees. The charities knew and agreed to the amount of the lease and knew that when the weekly proceeds did not cover the agreed rent, the Masinos would lower the amount due, effectively eliminating any financial risk to the charities. Importantly, however, under Florida law, because Racetrack Bingo

CASE NO. 3:16cr17-MCR

Based on the IGBA and money laundering verdicts, and pending adjudication of guilt, the Government seeks civil and criminal forfeiture of the Masinos' interests in various bank accounts and certain real property on several statutory grounds.[3] The Government also requests a money judgment. The following specific property is at issue:[4]

1. Funds in the amount of $80,484.85, seized from the First City Bank account ending in 4685 and held in the name of Racetrack Bingo Inc.;

---

conducted the games using paid employees and handled everything, including the game proceeds, with no participation by the charities in operating the games, those proceeds did not belong to the charities. Nor did they lawfully belong to Racetrack Bingo. As noted, Florida law required the proceeds of any bingo game conducted by a noncharitable organization, such as Racetrack Bingo, to be returned to the players as prizes and prohibited their use for any other purpose, as explained in the Court's order, ECF No. 182. Because Racetrack Bingo and the Masinos effectively shared with the charities the bingo proceeds that should have been returned to the players under Florida law, *see* Fla. Stat. § 849.0931, there was no evidence from which a jury could find an intent to harm property or money *belonging* to the charities.

 [3] *See* 18 U.S.C. § 981(a)(1)(C) (civil forfeiture of proceeds traceable to the "specified unlawful activity"); § 982(a)(1) (criminal forfeiture related to money laundering); § 1955(d) (forfeiture of property "used in violation" of the IGBA).

 [4] Some accounts have been seized or frozen already. Funds in accounts listed as items numbered 2, 3, and 4 above were seized by the Government on June 29, 2015, and those accounts listed in numbers 5 and 6 above were frozen pursuant to a restraining order entered on February 17, 2016, ECF No. 8. The Government also filed separate civil forfeiture cases related to items numbered 2, 3, and 7, which have been stayed pending resolution of this criminal case. *See United States v. Funds in the Amount of $43,635.99, Bank America Account ending in 7311,* Case No. 3:15cv477-MCR/EMT; *United States v. Real Property Located at 1500 Via De Luna Drive G-15 Pensacola Beach*, 3:15cv474-MCR/CJK; and *United States v. Funds in the Amount of $49,390.64, Bank America Account ending in 7308,* 3:15cv478-RV/EMT.

CASE NO. 3:16cr17-MCR

2.     Funds in the amount of $49,390.64, seized from Bank of America account ending in 7308 and held in the name of "Larry L. Masino Trust;"

3.     Funds in the amount of $43,635.99, seized from Bank of America account ending 7311 and held in the name of "Larry L. Masino Trust;"

4.     Funds in the amount of $337,212.37, seized from ServisFirst Bank account ending in 7110 and held in the name of "Dixie L. Masino Trust;"

5.     Funds in a Regions Bank account ending in 2321, held in the name of "Regions Bank as Trustee of the Dixie L. Masino Individual Retirement Account Under Agreement Dated August 17, 2009;"

6.     Funds in a Regions Bank account ending in 3605 held in the name of "Regions Bank as Agent for Dixie L. Masino as Trustee of the Dixie L. Masino Trust Under Amendment and Restatement Dated July 12, 2006;"

7.     Real property located at 1500 Via De Luna Drive, G-15, Pensacola Beach, Florida 32561, more particularly described as:

> Lot 15, Block G, First Addition to Regency Cabanas, a
> Subdivision of portion of the West 400 feet of Block 9
> Santa Rosa Villas Subdivision, according to the plat
> thereof recorded in Plat Book 11, Page 78, of the
> Public Records of Escambia County, Florida

CASE NO. 3:16cr17-MCR

8.     Real property located at 125 Nandina Road, Gulf Breeze, Florida 32561, more particularly described as:

> Lot 1, Block 14, Fifth Addition to Gulf Breeze Park
> according to the plat thereof, recorded in Plat Book B,
> Page(s) 154 of the Public Records of Santa Rosa
> County, Florida.

9.     Real property located at 4125 Baisden Road, Pensacola, Florida 32503, more particularly described as:

> Lot 41, Block 72, Cordova Park Unit No. 24, being a
> portion of Section 17 and 3, Township 1 and 2, Range
> 29 West, Escambia County, Florida, according to plat
> recorded in Plat Book 10 at Page 98 of the Public
> Records of said county.

At the preliminary forfeiture hearing, the Government presented the testimony of Philip Greeson, a Special Agent ("SA") with the IRS Criminal Investigation Division and a licensed Certified Public Accountant, who provided an analysis of the Defendants' financial records. SA Greeson testified that each parcel of real property listed above was paid for, in whole or in part, using funds treaceable to Racetrack Bingo. SA Greeson also traced the funds in each bank account listed above to the illegal gambling business. Limiting his analysis to those years in which adequate records were available for examination, he said the funds originated as bingo proceeds from games conducted by Racetrack Bingo, were deposited into

CASE NO. 3:16cr17-MCR

Racetrack Bingo's account as "lease" payments from the charities, and were subsequently deposited into the Masinos' personal accounts as salaries and profit distribution payments.[5]  In his opinion, the funds remaining in the identified accounts consist of proceeds with a direct nexus to the illegal bingo operation.

The Government presented several exhibits summarizing in detail how SA Greeson traced the financial transactions and deposits, and his testimony was not contradicted.  No other witness testified at the preliminary forfeiture hearing.  The Masinos oppose the forfeiture, relying on the trial record.

**Discussion**

After a guilty verdict, the court must determine what property is subject to forfeiture and what amount of money a defendant will be ordered to pay.  *See* Fed. R. Crim. P. 32.2(b)(1)(A).  If the forfeiture is contested, the court must hold a hearing after the verdict.[6]  Fed. R. Crim. P. 32.2(b)(1)(B).  The court may consider "evidence

---

[5] In SA Greeson's analysis of "proceeds," he conservatively treated as proceeds only the charities' rent payments and the profit distributions and salaries that Racetrack Bingo paid to the Masinos from the unlawful bingo business and did not include amounts that represented reimbursement of expenses.  Although as a noncharitable organization Racetrack Bingo (i.e., the Masinos) was not entitled to deduct expenses from the bingo proceeds, the Government has limited its forfeiture request to SA Greeson's more conservative definition of proceeds.

[6] At trial, the Masinos waived a determination of forfeiture by the jury and requested a hearing if there was a guilty verdict.  The forfeiture hearing was scheduled promptly after the Court ruled on the Defendants' motions for judgment of acquittal.

already in the record" and "any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." *Id.* The government bears the burden to establish that the property is subject to forfeiture by a preponderance of the evidence. 18 U.S.C. § 983(c)(1) (civil); *United States v. Hasson*, 333 F.3d 1264, 1277-78 (11th Cir. 2003) (criminal). Where the government seeks the forfeiture of specific property, courts consider "whether the government has established the requisite nexus between the property and the offense." Fed. R. Crim. P. 32.2(b)(1)(A). Also, a defendant's interest in the proceeds of a crime is properly forfeited by entry of a personal judgment against the defendant who committed the criminal act. *Id.; see also United States v. Elbeblawy*, 899 F.3d 925, 940 (11th Cir. 2018) ("The 'proceeds of crime constitute a defendant's interest in property' and 'can be forfeited in an *in personam* proceeding in a criminal case.'") (quoting *In re Rothstein, Rosenfeldt, Adler, P.A.,* 717 F.3d 1205, 1211 (11th Cir. 2013)), *pet. for cert. filed* (Nov. 13, 2018) (No. 18-6667); *United States v. Fleet*, 498 F.3d 1225, 1231 (11th Cir. 2007) (noting "criminal forfeiture acts *in personam* as a punishment against the party who committed the criminal acts").

If the court finds that property is subject to forfeiture, a preliminary order of forfeiture is promptly entered without regard to any third party's interest in the

property, Fed. R. Crim. P. 32.2(b)(2)(A). Any third party's interest is considered in a separate ancillary proceeding under Rule 32.2(c). *Id.* The court's preliminary order also may direct the forfeiture of substitute property, if the statutory criteria is met. *Id.* By statute, substitute property may be forfeited if, among other things, the property subject to criminal forfeiture "has been commingled with other property which cannot be divided without difficulty." 21 U.S.C. § 853(p)(1)(E); Fed. R. Crim. P. 32.2(e); *see also United States v. Ward*, 197 F.3d 1076, 1083 (11th Cir. 1999) ("Because money is fungible, the government must prove only that the tainted proceeds were commingled with other funds."); *see also id.* (noting that when money is commingled, "the illicitly-acquired funds and the legitimately-acquired funds cannot be distinguished from each other" (quoting *United States v. Moore*, 27 F.3d 969, 976-77 (4th Cir. 1994)).

In the instant case, the Government seeks forfeiture of specific property on multiple statutory grounds: (1) as property that "constitutes or is derived from proceeds traceable" to the "specified unlawful activity," which in this case is the illegal gambling business,[7] pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C.

---

[7] "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(A) as including any offense prohibited under 18 U.S.C. § 1961(1). The list of offenses in § 1961(1) includes the prohibition of illegal gambling businesses (§ 1955), which is the specified unlawful activity charged in Count Three.

CASE NO. 3:16cr17-MCR

§ 2461(c);[8] (2) as property "involved in" a money laundering offense or "traceable

to such property," pursuant to 18 U.S.C. § 982(a)(1); and (3) as property and money

"used in violation of" the IGBA, pursuant to 18 U.S.C. § 1955(d) and 28 U.S.C.

§ 2461(c). These statutes require forfeiture of the proceeds of the Masinos' illegal

gambling business.[9] Under 18 U.S.C. § 982(a)(1), property eligible for forfeiture

because it was "involved in" money laundering or traceable to such property

includes the money or property that was laundered, commissions or fees paid to the

money launderer, and any property used to commit or to facilitate the crime. *See*

*United States v. Seher*, 562 F.3d 1344, 1368-69 (11th Cir. 2009); *see also United*

*States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003). The Eleventh Circuit has

explained that property "facilitates" an offense if it "makes the prohibited conduct

less difficult or more or less free from obstruction or hindrance," or if it is proven

that the defendant commingled funds for the purpose of facilitating or disguising the

---

[8] Section § 2461(c) provides that whenever civil or criminal forfeiture of property is authorized in a criminal case, the Government may include notice of the forfeiture in the indictment and the court "shall" order forfeiture upon conviction as part of the sentence in the criminal case. 28 U.S.C. § 2461(c).

[9] The plain language of § 982(a)(1) and 28 U.S.C. § 2461(c) is mandatory, stating that the court "shall" order forfeiture as part of the sentence. *See United States v. Brummer*, 598 F.3d 1248, 1250-51 (11th Cir. 2010) (discussing § 2461(c), and stating "[t]he word 'shall' does not convey discretion"). Although § 981(a) states only that property is "subject to forfeiture," and § 1955(d) is phrased in discretionary terms, i.e., property used in violation of the IGBA "*may* be seized and forfeited," § 1955(d) (emphasis added), the Superseding Indictment couples these statutory forfeiture provisions with § 2461(c), which, as noted, mandates forfeiture on a conviction.

illegal scheme. *Seher*, 562 F.3d at 1368 (quoting *Puche*, 350 F.3d at 1153). While this definition of what constitutes property "involved in" the offense is broad, the Government must also prove that the property has "more than an incidental or fortuitous connection to criminal activity." *Id.* at 1369-70 (vacating forfeiture of a corporation's bank account due to the lack of evidence linking the cash from the offense to the corporate bank account).

A criminal forfeiture and a civil forfeiture that is at least partially a punishment are considered fines for Eighth Amendment purposes. *See generally United States v. Bajakajian*, 524 U.S. 321, 327-334 (1998); *Austin v. United States*, 509 U.S. 602, 618, 621-22 (1993). As such, forfeiture is unconstitutional if the court determines it is "grossly disproportional to the gravity" of the offense. *Seher*, 562 F.3d at 1371 (quoting *Bajakajian*, 524 U.S. at 337). Courts conduct this proportionality review on the facts peculiar to each case.

## A.   Nexus between Property and Offense

For reasons explained below, the Court finds that the Government has met its burden to establish by a preponderance of the evidence the requisite nexus between each item of property it seeks to forfeit and the Defendants' offenses on at least one of the listed statutory grounds.

1.    Racetrack Bingo account: $80,484.85

Racetrack Bingo Inc.'s First City Bank account ending in 4685, opened on August 5, 2013, held illegal bingo proceeds deposited into the corporate account in the form of "lease" payments to Racetrack Bingo from the charities, according to SA Greeson who traced the funds to the unlawful gambling business.  Although SA Greeson acknowledged that a small amount of deposits into the accounts were from sources such as vending sales that he did not consider as "proceeds," he clarified that, notwithstanding this "minute amount" of "clean" funds deposited into the account, all funds seized from the corporate account on June 29, 2015, should be considered illegal proceeds under the "lowest intermediate balance" accounting principle.  ECF No. 205, at 59. The lowest intermediate balance rule "attempts to divide tainted and untainted money" when proceeds are commingled with other funds.  *In re Lee*, 574 B.R. 286, 295 n. 52 (Bankr. M.D. Fla. 2017) (tracing trust funds and quoting *In re Rothstein*, 717 F.3d at 1214).[10] This rule attributes withdrawals first to "clean funds," with the tainted proceeds presumed remaining.

---

[10] In *Lee*, the court explained that "the lowest intermediate balance in a commingled account represents trust funds that have never been dissipated and which are reasonably identifiable."  Courts in this circuit have approved use of this method for tracing money through accounts where assets have been commingled.  *See Lee,* 574 B.R. at 295; *see also United States v. Banco Cafetero Pan.,* 797 F.2d 1154, 1159 (2d Cir. 1986) (applying the concept in the criminal drug forfeiture context).

CASE NO. 3:16cr17-MCR

While Larry argued that the funds deposited into the account were not all "proceeds," he did not directly challenge the viability of this accounting principle. The Court agrees with the Government that the account is forfeitable as proceeds for purposes of § 981(a)(1)(C) under the lowest intermediate balance rule because, even considering that some of the deposits originated from vending sales, the illegal proceeds deposited into the account far exceeded the amount remaining in the corporate account when it was seized.

The Masinos argue that the funds in the corporate account are not subject to criminal forfeiture because Racetrack Bingo, a separate corporate entity, is not a defendant in the case and because these funds had not yet been distributed to them. They rely on a recent Supreme Court case holding that forfeiture under the drug forfeiture statue "is limited to property the defendant himself actually acquired as the result of the crime;" that is, a defendant cannot be held jointly and severally liable for tainted proceeds simply by virtue of being a co-conspirator. *Honeycutt v. United States*, 137 S. Ct. 1626, 1632-35 (2017) (construing forfeiture under 21 U.S.C. § 853(a) and the substitute property provision of § 853(p) to preclude joint and several liability unless the defendant personally acquired the tainted property); *see also United States v. Carlyle*, 712 F. App'x 862, 864-65 (11th Cir. 2017)

CASE NO. 3:16cr17-MCR

(unpublished) (reasoning that *Honeycutt's* interpretation of § 853 "likely" applies to forfeiture under § 981(a)(1)(C) because "the two statutes are largely the same in terms of their pertinent language"). According to the Masinos, they never personally acquired the funds that remain in the corporate account.

The Court rejects the Masinos' narrow view of the record and concludes that forfeiture of the corporate account in this case is appropriate. In *Honeycutt*, the Court determined that a co-conspirator defendant who had no ownership interest in a business engaged in selling an illegal substance and who did not profit from the illegal sales could not be personally liable for the proceeds merely for having been a co-conspirator. *See Honeycutt*, 137 S. Ct. at 1634-35 (rejecting *Pinkerton v. United States*, 328 U.S. 640 (1946) for purposes of *in personam* forfeiture under 21 U.S.C. § 853). The record here, by contrast, establishes by a preponderance of the evidence that Racetrack Bingo and the Masinos are effectively one in the same; the Masinos' total control of the business and its bank account demonstrates that they acquired the tainted property by directing its deposit into Racetrack Bingo's account as "rent." As noted earlier, *see supra* Note 2, and in the Court's prior order, ECF No. 182, Larry and Dixie created, owned, controlled, and used Racetrack Bingo to carry out their illegal gambling business and as integral in facilitating their money

laundering, making it appear they were running a legitimate bingo hall rental/vending business when in fact they were conducting the games, controlling the proceeds, and profiting from the business. The Masinos deposited or directed the deposit of the proceeds into the corporate account as "rent" and controlled the company's distribution of the proceeds as salary payments and profit distributions to the Masinos and their children. Larry, Dixie, and their children are the only shareholders of the company and the bingo operation was Racetrack Bingo's only business. Dixie was the sole authorized signatory on the corporate account, but the record shows that she regularly consulted with Larry on the operation of the business and made profit distributions when Larry requested or advised her to do so, as evidenced in emails admitted at trial. *See* Gov't Trial Exs. 3a-26, 3a-39. Thus, the account is also forfeited as "used" by the Masinos in the illegal gambling business offense, *see* § 1955(d), and as facilitating the money laundering offenses for purposes of § 982(a)(1). *See Seher*, 562 F.3d at 1369 ("The term 'involved in' has consistently been interpreted broadly by courts to include any property involved in, used to commit, or used to facilitate the offense.") (internal quotations omitted).

     2.    <u>Larry Masino's Bank of America checking account ending in 7308—</u>
<u>$49,390.64</u> and

     3.    <u>Larry Masino's Bank of America savings account ending 7311—</u>
<u>$43,635.99</u>

SA Greeson's testimony and the financial records establish that the Bank of America checking account ending in 7308 and the Bank of America savings account ending in 7311 held by the Larry L. Masino Trust, with Larry as the sole trustee, were used for the deposit of the proceeds from the illegal gambling operation and thus are directly traceable to Racetrack Bingo's illegal business. Although SA Greeson noted that some deposits into Larry's accounts were not considered proceeds, he determined that the majority of the deposits were salary payments and profit distributions from Racetrack Bingo's bingo operation.[11] On cross examination, SA Greeson testified that in fact 99.9% of the funds remaining in the 7311 account ($43,633.38) and 92.8% of the funds remaining in the 7308 account ($45,970.60) when seized were proceeds of Racetrack Bingo. ECF No. 205, at 16 & 63 (SEALED Tr.). There is no question that these large portions of the funds deposited into the accounts identified as proceeds are forfeitable. *See* § 981(a)(1)(C), § 982(a)(1). Moreover, the small amounts that SA Greeson

---

[11] Larry was found guilty on Counts Sixteen through Twenty-One based on the deposit of checks into the # 7308 account (Gov't Ex. AF-7a) that totaled $245,130.

CASE NO. 3:16cr17-MCR

determined could not be directly confirmed as proceeds (i.e., .1% of #7311 and 7.2% of #7308), should be forfeited under the lowest intermediate balance rule, as discussed above.[12] Given that the deposits of tainted proceeds from Racetrack Bingo far exceeded the funds seized on June 29, 2015, the Court finds that the entire balance is properly considered tainted and forfeitable as proceeds.

Moreover, even if the small amount that was not traced as proceeds is considered "clean," Larry knowingly deposited his profits from the illegal gambling business into these accounts, commingling them with the incidental "clean" funds. Consequently, the small amount of "clean" funds are alternatively forfeitable as substitute property. *See* 21 U.S.C. § 853(p)(1)(E) (allowing forfeiture of substitute property where property "has been commingled with other property which cannot be divided without difficulty"); *see also Ward*, 197 F.3d at 1083 (stating proceeds commingled with legitimate funds cannot be distinguished from each other).[13]

---

[12] *See* ECF No. 205, at 59-61 (explaining the lowest intermediate balance rule when discussing the corporate account); ECF No. 205, at 63 (discussing accounts ending in 7308 and 7311).

[13] Civil forfeiture statutes also provide that when illegal proceeds and clean funds are mixed, the Government is not required to identify the specific cash that is the basis of the forfeiture where the indictment is commenced within one year of the offense. *See* 18 U.S.C. § 984 (providing for forfeiture of fungible property and stating a one-year limitation on the forfeiture of fungible property that is commingled). Larry has made no substantive argument that the funds in these accounts are not forfeitable but instead argues that the forfeiture is unconstitutional, and this argument is addressed *infra*.

CASE NO. 3:16cr17-MCR

4.     Dixie Masino's ServisFirst Bank account ending in 7110

The record also establishes that 100 percent of the funds seized from a ServisFirst Bank account ending in 7110, held in the name of "Dixie L. Masino Trust," for which Dixie is the sole trustee, were traceable to proceeds from Racetrack Bingo's operation.  This account held $337,212.37 when seized and consisted of funds that had been transferred from Dixie's Regions Bank account ending in 0927, which held her salary payments and profit distributions from Racetrack Bingo.[14] Due to limited financial records and the lack of deposit information, SA Greeson confined his analysis of the Regions Bank 0927 account to funds deposited after the statement dated December 24, 2009, although he had no evidence that Dixie deposited proceeds from Racetrack Bingo into any other bank account prior to that time.  He determined, based on the records existing after December 2009, that the balance seized in June 2015 ($337,212.37) was tainted.

Dixie argues that forfeiture of the 7110 account, as well as the other accounts in her name, is not proper because the Government failed to prove what portion of the accounts she innocently acquired through her 2009 divorce settlement and before she began to play an active role operating Racetrack Bingo in 2010.  The Court is

---

[14] The records reflect that one $40,000 profit distribution check from Racetrack Bingo was deposited directly into the 7110 account in June 2015, as charged in Count Forty-One.

not persuaded by this argument. The jury found that Dixie had "knowingly conducted, financed, managed, supervised, directed, or owned all or part of" an illegal gambling business and that she participated in a money laundering conspiracy. The Court has already determined that the evidence supported the verdicts. As outlined by the Government in its forfeiture brief, ECF No. 200, and in the Court's prior order, ECF No. 182, the evidence supported a finding that Dixie was an owner as well as at times an officer and operator of Racetrack Bingo. She was aware of the nature of Racetrack Bingo's business and knowingly profited from it well before her divorce and before she exercised an active operating role in Racetrack Bingo. Dixie had been involved in the decision to start the business and helped obtain financing for it. She was listed as a director when Racetrack Bingo was incorporated in 2002. Furthermore, she was aware of the criminal investigation into their Tallahassee bingo operation, which was run in the same manner as Racetrack Bingo, at least by 2009. She also participated in the money laundering conspiracy by distributing the illegal bingo profits into her personal bank accounts. After her divorce in 2009, Dixie became the president of Racetrack Bingo and continued operating the business in the same manner as Larry, with his continuing input and advice. She continued distributing profit checks from Racetrack Bingo

and depositing funds into her own personal accounts through 2015. This forfeiture proceeding does not provide Dixie with a second chance to argue for a judgment of acquittal.

The Court further finds that the ServisFirst # 7110 account was "used" in the commission of the IGBA offense and "involved in" the money laundering offenses. Dixie deposited her illegally earned income and profit distribution checks from the bingo operation first into the Regions Bank 0927 account and then transferred them to the 7110 account, and at least one distribution check was deposited directly into this account. The Government's Exhibit AF-7b shows that even limiting consideration to the deposits after February 2011, when Dixie was indisputably actively involved in running the business, the deposits directly traceable to Racetrack Bingo's operation totaled over $700,000. SA Greeson's testimony tracing the funds is not disputed. Thus, the entire amount seized from the 7110 account ($337,212.37) is forfeited pursuant to §§ 981(a)(1)C), 982(a)(1), 1955(d).

5.    Dixie Masino's Regions Bank IRA account ending in 2321

SA Greeson similarly testified that Dixie's Regions Bank IRA account ending in 2321 held in the name of "Regions Bank as Trustee of the Dixie L. Masino Individual Retirement Account Under Agreement Dated August 17, 2009" (frozen

by Court order in February 2016) also constituted proceeds from the bingo operation. Records showed that in September 2009, a Lincoln Financial Group Account held by Larry and Dixie Masino, totaling over $700,000 and consisting wholly of proceeds deposited from Racetrack Bingo distributions (Gov't Ex. AF-7f), was partially transferred ($395,277.80) to a new Lincoln Financial Group Account ending in 1153 as a result of the Masinos' divorce settlement agreement. Subsequently on January 15, 2010, the 1153 account rolled over into Dixie's Regions Bank IRA account ending in 2321. Some additional funds ($36,500) were also transferred from Dixie's 0927 bank account into 2321. SA Greeson testified that $18,000 of those funds could not be confirmed as illegal proceeds due to limited financial records. As of February 2018, when Dixie was convicted, this IRA account ending in 2321 had a market value of $644,371.96.

Again, Dixie maintains it is not sufficient to show that the funds in her IRA account were derived from Racetrack Bingo prior to her divorce because there is no evidence that she was involved in operating or managing the business until 2011 and thus she maintains she was an innocent third party before then, with no actual knowledge that criminal funds were commingled. And again, the Court disagrees. For reasons stated above, Dixie's knowledge can be inferred from the circumstances.

She accepted the rollover IRA funds knowing their source, and having been found guilty of the offense based on this sufficient evidence, she cannot now claim to be an innocent third party.

The Court finds that Dixie's IRA account consisted of Racetrack Bingo proceeds, except for $18,000, which SA Greeson could not confirm as proceeds through the available records. The $18,000 is nonetheless also forfeited as substitute property because it was commingled in the account with the illegal proceeds, and the total amount of proceeds distributed to Dixie far exceeds this amount. The substitute asset provision of § 853 provides that "the court shall order the forfeiture of any other property of the defendant" where "as a result of any act or omission of the defendant," forfeitable property, such as proceeds, "has been commingled with other property which cannot be divided without difficulty." 21 U.S.C. § 853(p)(1)(E). It is well established that "[b]ecause money is fungible, the government must prove only that the tainted proceeds were comingled with other funds." *Ward*, 197 F.3d at 1083 (also noting commingling suggests "a design to hide the source of ill-gotten gains" (internal quotation omitted)). The Government may seek forfeiture of substitute property "up to the value" of the commingled property. 21 U.S.C. § 853(p)(2); *see In re Rothstein*, 717 F.3d at 1212. Therefore,

because the IRA account is forfeited in its entirety as proceeds of the IGBA offense, as "used" in the IGBA offense, as "involved in" the money laundering offenses, and as substitute property to the extent $18,000 of clean funds are comingled in the account.

6.     Dixie Masino's Regions Bank account ending in 3605

The final account at issue controlled by Dixie is a Regions Bank account ending in 3605, held in the name of "Regions Bank as Agent for Dixie L. Masino as Trustee of the Dixie L. Masino Trust Under Amendment and Restatement Dated July 12, 2006" (frozen by Court order in February 2016). In August 2009, DixLar, Incorporated, repaid a loan to Dixie as a shareholder of DixLar, in the amount of $234,652.35. Dixie deposited this into an account from which, in September 2009, she transferred $400,000 into this Regions Bank account ending in 3605. SA Greeson's analysis of these financial records reflects that $161,879.84 of the funds deposited into the #3605 account consisted of illegal proceeds from Racetrack Bingo's operation. As of February 2018, the balance in the account was $443,423.04. Gov't Ex AF-7g.

Dixie argues that the bulk of the Regions Bank account #3605 is not subject to forfeiture because it consisted of a loan repayment from DixLar, Inc. in August

2009, which was prior to her active involvement in operating the illegal business. The Court rejects this argument for reasons stated previously. The Court finds that $161,879.84 of the Regions Bank account ending in 3605, controlled by Dixie, constitutes illegal proceeds as traced by SA Greeson and is properly forfeited based on the IGBA offense and the money laundering offenses. *See* §§ 981(a)(1)(C), 982(a)(1), 1955(d). The remainder of funds in that account are forfeited as substitute property.

7.  Condo at 1500 Via De Luna Drive, G-15, Pensacola Beach, Florida

Larry Masino purchased the Via de Luna Drive condo on June 2, 2015, for $239,000, using $194,082.43 in funds from Racetrack Bingo's operation. SA Greeson determined that the remainder of the purchase funds (approximately $43,000) were "clean funds," which he understood may have come from Lorraine Bracken, who presently lives in the home. Because proceeds of the bingo operation were used to purchase the home, Larry's interest in the property is forfeited to the Government as traceable to profit distributions and involved in the money laundering offenses. *See* §§ 981(a), 982(a); *see also United States v. 4323 Bellwood Circle, Atlanta, Ga. 30349,* 680 F. Supp. 2d 1370, 1377 n.7 (N.D. Ga. 2010) (citing cases finding real property was involved in or traceable to an offense, including a

money laundering offense, where substantial payments of laundered funds were made toward the purchase of the property or for improvements).

Larry has requested a stay of the preliminary order of forfeiture as to this asset because of Ms. Bracken's interest in the property. The Government does not object to a stay on entry of the final order. Federal Rule of Criminal Procedure 32.2(d) provides that the court may stay the order of forfeiture if a defendant appeals from a conviction or an order of forfeiture. The Defendants have indicated their intent to appeal. Thus, on Defendants' filing of a notice of appeal, the final judgment of forfeiture will be stayed as to this property.

8.    Real Property at 125 Nandina Road, Gulf Breeze, Florida

In April 2015, Larry paid cash through a wire transfer in the amount of $296,370.16 (plus $2,000 in title fees) for the purchase of his home on Nandina Road in Gulf Breeze, Florida. SA Greeson testified that this cash is 100 percent traceable to Racetrack Bingo's operation and traceable to money involved in the money laundering offenses. As such, the property is forfeited to the Government pursuant to §§ 981(a)(1)(C), 982(a)(1).

The Court notes that if illegal proceeds had not been used to purchase this property, the Court would not forfeit it. The Court rejects the Government's

argument that there is a sufficient nexus to justify forfeiture based on "use" of the property alone. Section 1955(d) applies to "any property . . . used in violation" of the IGBA, including real property. *United States v. Premises Located at Route 13*, 946 F.2d 749, 753 (11th Cir. 1991), *as amended* (Nov. 5, 1991). But the Government is required to establish a nexus to the offense that is not merely fortuitous or incidental. *See Seher*, 562 F.3d at 1370. The Government argues that Larry "used" the home for the IGBA offense by producing and storing documents at the home, sending emails and faxes related to the business from a computer at the home, and watching Racetrack Bingo security cameras while at home. This use, standing alone, is insufficient. Ordinarily, to establish the requisite connection to an IGBA offense, there is evidence that some portion of the gambling offense was committed at the premises. *See, e.g., United States v. Premises Known as 318 South Third Street*, 988 F.2d 822, 827-28 (8th Cir. 1993) (allowing forfeiture of property where the gambling offense had occurred on the second floor and the operation was permitted by a national organization); *United States v. Iacaboni*, 221 F. Supp. 2d 104, 115 (D. Mass. 2002) (stating IGBA forfeiture would be proper, if charged, because the property was used to promote a bookmaking business; envelopes of money for the business were dropped off and picked up from the garage; faxes and phone calls related to the

enterprise were sent from the home; and the defendant "corrected" tickets used in the gambling offense at the home), *reversed on other grounds*, 363 F.3d 1 (1st Cir. 2004). Here, by contrast, Racetrack Bingo operated the games in a bingo hall where its business office was located. No bingo games were conducted at Larry's home, no bingo equipment was stored there, and no management meetings were held there. On this record, the connection between the bingo business and Larry's home was incidental at best because the home was not "used" for the IGBA offense in any meaningful way, aside from being purchased with proceeds of the unlawful activity.

     9.    <u>Real Property located at 4125 Baisden Road, Pensacola, Florida</u>

The original mortgage on the property located on Baisden Road in Pensacola, which is Dixie's home, was refinanced in January 2003 in the amount of $262,500. The borrowers were identified as Larry and Dixie Masino, husband and wife. As a result of the Masinos' divorce in 2009, this property was transferred to the "Dixie L. Masino Trust dated July 12, 2006." Dixie was the Trustee and took sole ownership of the property via warranty deed dated July 9, 2009. The outstanding loan on the property was paid in full on March 1, 2011. (*See* Govt. Ex. AF-5b and AF-7e). SA Greeson traced the loan payments since December 2009, totaling $87,979.92, to Dixie's Regions Bank account ending in 0927 and testified that these payments are

directly traceable to Racetrack Bingo proceeds. Greeson could not confirm the origin of other payments due to a lack of bank records. Thus, Dixie's interest in the home up to the amount of $87,979.92 is forfeited because it was purchased with illegal proceeds directly traceable to the illegal gambling business and the money laundering activities, pursuant to §§ 981(a)(1)(C), 982(a)(1). The remainder of her interest in the home is forfeited as substitute property.

As with Larry's home on Nandina road, the Government also argues that IGBA forfeiture applies to Dixie's home because it was "used" to facilitate the gambling business. It is true that Dixie produced and stored documents and correspondence related to the business there, sent daily and weekly faxes from the home related to the business, and used a computer in the home to communicate via email with employees and the charities. However, as with the Nandina Road property, there is no evidence that any illegal gambling activity was conducted at the home or any bingo equipment was stored there. There was also no evidence that proceeds were delivered to the home, that payroll was administered from the home, or that any meetings were held there. Dixie's home was not used to operate the bingo business, so there is an insufficient nexus to the IGBA offense. The home, however, is forfeited, as determined above, based on the use of proceeds for its

purchase and as substitute property to the extent records did not exist to trace the earlier mortgage payments to illegal proceeds.

    10.    <u>Forfeiture Money Judgment</u>

The Government also seeks a forfeiture money judgment against the Masinos for the full amount of illegal proceeds distributed from the business. The Government established that, through their control of Racetrack Bingo, Larry and Dixie distributed a total of $5,813,584 to its shareholders—the Masinos and their three children—in the form of salaries and profit distribution checks drawn on Racetrack Bingo's accounts. Larry and Dixie personally received a total of $4,667,605, which was divided between them as profit distributions to Dixie in the amount of $2,337,241 from 2006 through 2015 and to Larry in the amount of $2,330,364 during that same time. (Gov't Ex. AF-7h). The Court finds by a preponderance of the evidence that the total amount of profit distributions ($5,813,584) constitutes illegal proceeds. The Court is required to enter a preliminary order of forfeiture setting out the amount of any money judgment on finding that the property is subject to forfeiture. Fed. R. Crim. P. 32.2(b)(2)(A).

The Government argues that the Masinos should be held jointly and severally liable for the whole amount of reasonably foreseeable proceeds resulting from their

offenses. The Masinos oppose joint and several liability for the whole on grounds

that under *Honeycutt*, a co-conspirator can no longer be held jointly or severally

responsible for amounts that he or she did not personally acquire simply by virtue of

being a co-conspirator. *See Honeycutt,* 137 S. Ct. at 1635. While it is true that

*Honeycutt* has altered the legal landscape regarding criminal forfeitures for a co-

conspirator, *see e.g., Elbeblawy*, 899 F.3d at 941-42 (applying *Honeycutt's*

reasoning to the healthcare forfeiture statute and remanding for a new forfeiture

determination); *Carlyle*, 712 F. App'x at 864-65 (same with regard to

§ 981(a)(1)(C)), the Court emphatically disagrees with the Masinos'

characterization of the record. As discussed earlier, the Masinos' acquired the illegal

proceeds by virtue of their joint ownership and participation in creating and

controlling Racetrack Bingo. The record establishes that both benefitted personally

even when one or the other was solely in control.[15] Also, there is clear evidence, as

noted earlier, that when Dixie was in control, she consulted and received advice from

Larry on when to make profit distribution payments to themselves and their children.

*See* Gov't Trial Exs. 3a-26, 3a-39. This control over the business in both acquiring

the illegal proceeds and distributing the profits for their personal benefit

---

[15] Dixie argues that there is insufficient proof that she was part of a money laundering
scheme prior to 2011, but the evidence, as discussed above, shows otherwise.

CASE NO. 3:16cr17-MCR

distinguishes this case from *Honeycutt*, where the co-conspirator had no ownership in the business and reaped no personal benefit. Therefore, the Court finds that the Government is entitled to a forfeiture money judgment against Larry and Dixie, jointly and severally, in the amount of $5,813,584.

### B.     Excessive Fines Clause

Forfeiture orders imposed at the end of a criminal proceeding based on a guilty verdict are considered fines "subject to the Eighth Amendment's prohibition of excessive fines."[16] *Seher*, 562 F.3d at 1371; *see also Austin v. United States*, 509 U.S. 621, 618, 621-22 (holding even civil forfeiture that is at least partially punishment for an offense is subject to Eighth Amendment scrutiny). A forfeiture order is excessive in violation of the Eighth Amendment "if it 'is grossly disproportional to the gravity of a defendant's offense.'" *Id*. (quoting *Bajakajian*, 524 U.S. at 337). In determining if a forfeiture violates the Eighth Amendment, courts consider the facts of the case in light of three nonexclusive factors: "(1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant." *United States*

---

[16] The Supreme Court has now held that the Eighth Amendment applies also to forfeitures under state law. *See Timbs v. Indiana*, 2019 WL 691578, No. 17-1091 (Feb. 20, 2019).

CASE NO. 3:16cr17-MCR

*v. Browne*, 505 F.3d 1229, 1281 (11th Cir. 2007) (citing *Bajakajian*, 524 U.S. at 337-40). In the IGBA context, the Eleventh Circuit also has considered how the real property was used in relation to the crime when considering proportionality. *See United States v. One Single Family Residence*, 13 F.3d 1493, 1498-99 (11th Cir. 1994) (finding IGBA forfeiture of a family home disproportionate under Eighth Amendment principles where the 80-year old invalid owner used it for poker games sporadically on Wednesday nights "when enough people showed up").

Larry argues that the forfeiture of Racetrack Bingo profit distributions, his home, Lorraine Bracken's home, and virtually all of his money ($93,026.63 in the bank accounts), is excessive and grossly disproportionate to the gravity of his offense. Dixie argues that requiring the forfeiture of property she acquired through her divorce settlement is excessive because she accepted this property without knowing it was subject to forfeiture, and she maintains she was not actively involved in operating or managing the business until after the divorce settlement. The Court concludes that forfeiture of illegal bingo proceeds actually and knowingly received by the Defendants and involved in their money laundering crimes does not constitute an excessive fine under the Eighth Amendment.

Considering the factors outlined above, first, there is no serious argument that the Masinos are outside the class of persons at whom the federal statutes are directed. Although both Defendants attempt to minimize their conduct by arguing that Racetrack Bingo was a small family business, "largely patronized by little old ladies seeking an evening's entertainment," Florida law and the IGBA clearly prohibit a noncharitable business from conducting bingo games and profiting from them, regardless of whether that business is run by a family or a national organization.[17] The underlying state law violation may be a misdemeanor, but Congress designated the IGBA offense as a felony. Notably, the Defendants fail to acknowledge that Racetrack Bingo grossed over $20 million during the time period charged in the Superseding Indictment. The Masinos deny joint involvement during the first four years of the conspiracy based on Dixie having no active management role until after the divorce, when she took over, but the record establishes that both Dixie and Larry were owners of Racetrack Bingo for the entire duration of the charged conduct. As

---

[17] The undersigned originally dismissed the IGBA charge on grounds that Florida law does not consider a bingo violation to be a gambling offense, but the Eleventh Circuit has made clear that operating a bingo business contrary to Florida law is a gambling offense under the federal statute, and importantly, that decision is the law of this case. *See United States v. Masino*, 869 F.3d 1301, 1306-09 (11th Cir. 2017) (concluding that for purposes of the IGBA, "gambling" is defined by federal law, not state law, and under federal law, the definition of gambling includes bingo).

CASE NO. 3:16cr17-MCR

noted *supra* and in sustaining the jury verdicts, each, at various times, operated the illegal gambling business in violation of federal and state law. The evidence shows they both knew the nature of the illegal business, profited from the illegal gambling business from its beginning, and participated in a money laundering conspiracy. Thus, the federal statutes were directed at them.

Regarding the second factor—other penalties—the Eleventh Circuit applies "a strong presumption that a criminal forfeiture is not excessive if it is within the statutory range of fines prescribed by Congress." *United States v. Chan*, 729 F. App'x 765, 772 (11th Cir. 2018) (citing *United States v. Dicter*, 198 F.3d 1284, 1292 (11th Cir. 1999)). The maximum fine for a money laundering conviction is twice the amount of the criminally derived property involved in the transaction. *Id.* (citing 18 U.S.C. § 1957(b)(2)). In this case, the Government is seeking forfeiture of only proceeds, i.e., property traceable to proceeds or criminally derived property.[18]

---

[18] Larry cites to *Timbs v. Indiana*, 2019 WL 691578, No. 17-1091 (Feb. 20, 2019), as new authority in support of his Eighth Amendment argument. *See* Notice of Additional Authority for Defendant Larry Masino's Forfeiture Brief, ECF No. 213. The Court notes that in *Timbs*, a LandRover SUV had been used to transport heroin but had been purchased using money received from an insurance policy when the defendant's father died, not drug proceeds. The purchase price was more than four times the maximum fine for the crime of conviction. The state trial court found the forfeiture of the SUV grossly disproportionate, but the state supreme court reversed, concluding that the Eighth Amendment did not apply to the state forfeiture proceeding. The United States Supreme Court reversed and remanded, concluding that the Eighth Amendment does apply to the states. The facts of the present case are distinguishable from those found by the *Timbs* trial court to be grossly disproportionate. Here, the real property at issue was purchased with illegal

The final factor, that of harm caused by the defendants, also weighs in favor of finding the forfeiture not grossly disproportionate. Larry argues the Court should consider as mitigating the fact that no other criminal activity was pursued outside of the bingo parlor and, in his view, the money laundering offenses were routine bank deposits made with no effort to hide the source of the funds or to use them to fund additional criminal endeavors. Again, without revisiting the motion for judgment of acquittal, it is clear from the record that the Masinos' operation was successful because of the way they used Racetrack Bingo Inc. to make it appear they were operating a legitimate business. Larry also argues that because the charities had full knowledge of how the games were being conducted, there was no harm caused by the offense, and in fact, the community benefitted significantly from their conduct. In large part, this is true. *See supra* Note 2. It is undisputed that the bingo operation benefitted the local charities involved by providing them more than $14 million in funding they otherwise would not have had. Regardless, Florida law does not permit a noncharitable organization to conduct bingo games and retain *any* profit, even if that profit is also shared with a charity. Fla. Stat. 849.0931(3) (noncharitable

---

proceeds and the accounts forfeited are proceeds, not money legitimately obtained as in *Timbs*. Thus, the underlying facts of *Timbs* do not persuasively show that the forfeiture in this case is grossly disproportionate.

CASE NO. 3:16cr17-MCR

organization's right to conduct bingo is conditioned on the return of all proceeds of the game to the players as prizes). And charities are prohibited from sponsoring another to conduct bingo games in their name. Florida's bingo law thereby represents an effort to eliminate commercial bingo, *see State v. S. Cty. Jewish Fed'n*, 491 So. 2d 1183, 1186 (Fla. 2d DCA 1986) (stating the state Legislature never intended to allow "a large-scale commercial bingo operation" under the bingo statute). The same can be said for the IGBA, which exempts only charities. Thus, Congress has determined that there is societal harm in the commercial operation of bingo by a business in violation of state law. For the same reason, Larry cannot prevail on his argument that the forfeiture is excessive because it does not serve any remedial purpose absent a showing of loss. Although the money cannot be returned to the players and the charities themselves were not harmed in their money or property, the IGBA plainly authorizes the forfeiture of any money or property "used" in violation of the statute, without regard to whether the Government or a specific victim suffered a loss, *see* § 1955(d), and proceeds of the offense as well as any property involved in the money laundering offense must be forfeited, *see* §§ 981(a), 982(a).

CASE NO. 3:16cr17-MCR

To the extent the Defendants rely on *Bajakajian* as support for finding that the forfeiture is disproportionate, this reliance misplaced. In that case, the Supreme Court determined that the Government's attempt to forfeit the entire amount of cash that the defendant had failed to report when leaving the country ($357,144), and which was otherwise lawfully obtained and lawfully possessed, was grossly disproportionate and excessive. *Bajakajian,* 524 U.S. at 337-40. The facts of this case differ markedly. All of the property being forfeited in this case consisted of illegal proceeds from the bingo operation, property purchased with illegal proceeds, or property used or involved in in the illegal bingo or money laundering violations. The Court concludes that requiring each defendant to forfeit the profit distributions he or she individually received and property, or interests in property, that was purchased in whole or part using those proceeds is not grossly disproportionate to their crimes.[19] Therefore, the forfeiture in this case is not an excessive fine in violation of the Eighth Amendment.

Accordingly, by virtue of the guilty verdicts and forfeiture findings, the Government's Motion for Issuance of a Preliminary Order of Forfeiture, ECF No.

---

[19] The Government is not seeking the entire $20 million grossed by the operation.

CASE NO. 3:16cr17-MCR

189, and Motion for Issuance of Forfeiture Money Judgment in the amount of $5,813,584.00, ECF No. 190, are **GRANTED** as follows:

A. It is ORDERED that an Order of Preliminary Forfeiture is hereby entered in favor of the United States against the Defendants pursuant to Rule 32.2(b) of the Federal Rules of Criminal Procedure, by which all of the Defendants' rights and interests in the following Subject Property is hereby forfeited to and vested in the United States of America:

1. Funds in the amount of $80,484.85, seized from First City Bank account ending in 4685 and held in the name of Racetrack Bingo Inc.;

2. Funds in the amount of $49,390.64, seized from Bank of America account ending in 7308 and held in the name of "Larry L. Masino Trust;"

3. Funds in the amount of $43,635.99, seized from Bank of America account ending 7311 and held in the name of "Larry L. Masino Trust;"

4. Funds in the amount of $337,212.37, seized from ServisFirst Bank account ending in 7110 and held in the name of "Dixie L. Masino Trust;"

5. Funds in a Regions Bank account ending in 2321, held in the name of "Regions Bank as Trustee of the Dixie L. Masino Individual Retirement Account Under Agreement Dated August 17, 2009;"

CASE NO. 3:16cr17-MCR

6.      Funds in a Regions Bank account ending in 3605 held in the name of "Regions Bank as Agent for Dixie L. Masino as Trustee of the Dixie L. Masino Trust Under Amendment and Restatement Dated July 12, 2006;"

7.      Larry Masino's interest in real property located at 1500 Via De Luna Drive, G-15, Pensacola Beach, Florida 32561, more particularly described as:

> Lot 15, Block G, First Addition to Regency Cabanas, a
> Subdivision of portion of the West 400 feet of Block 9
> Santa Rosa Villas Subdivision, according to the plat
> thereof recorded in Plat Book 11, Page 78, of the
> Public Records of Escambia County, Florida[20]

8.      Real property located at 125 Nandina Road, Gulf Breeze, Florida 32561, more particularly described as:

> Lot 1, Block 14, Fifth Addition to Gulf Breeze Park
> according to the plat thereof, recorded in Plat Book B,
> Page(s) 154 of the Public Records of Santa Rosa
> County, Florida.

9.      Real property located at 4125 Baisden Road, Pensacola, Florida 32503, more particularly described as:

> Lot 41, Block 72, Cordova Park Unit No. 24, being a
> portion of Section 17 and 3, Township 1 and 2, Range
> 29 West, Escambia County, Florida, according to plat
> recorded in Plat Book 10 at Page 98 of the Public
> Records of said county.

---

[20] As stated *supra,* on Defendants' filing of a notice of appeal, the final judgment of forfeiture will be stayed as to this property.

CASE NO. 3:16cr17-MCR

B.     It is ORDERED that the following procedures apply:

1.     The United States shall publish notice of the Order and its intent to dispose of the Subject Property in such a manner as the Attorney General (or a designee) or the Secretary of the Treasury (or a designee) may direct.  The United States may also, to the extent practicable, provide written notice to any person known to have an alleged interest in the above-described property.

2.     Any person, other than the above-named defendants, asserting a legal interest in the Subject Property may, within thirty days of the Final Publication of Notice or Receipt of Notice, whichever is earlier, petition the Court for a hearing without a jury to adjudicate the validity of his/her alleged interest in the Subject Property, and for an amendment of the Order of forfeiture, pursuant to 18 U.S.C. § 982(b)(1), which incorporates 21 U.S.C. § 853(n).

3.     Pursuant to Fed. R. Crim. P. 32.2(b)(3), this Preliminary Order of Forfeiture shall become final as to the Defendants at the time of sentencing, or before sentencing if the Defendants consent, and shall be made part of the sentence and included in the judgment.

4.     Any petition filed by a third party asserting an interest in the Subject Property shall be signed by petitioner under penalty of perjury and shall set

forth the nature and extent of the petitioner's right, the title, or interest in the Subject

Property, the time and circumstances of the petitioner's acquisition of the right, title

or interest in the Subject Property, any additional facts supporting the petitioner's

claim and the relief sought.

       5.     After the disposition of any motion filed under Fed. R. Crim. P.

32.2(c)(1)(A), and before a hearing on the petition, discovery may be conducted in

accordance with the Federal Rules of Civil Procedure upon a showing that such

discovery is necessary or desirable to resolve factual issues.

       6.     The United States shall have clear title to the Subject Property

following the Court's disposition of all third-party interests, or, if none, following

the expiration of the period provided in 21 U.S.C. § 853(n)(2) (which is incorporated

by 18 U.S.C. § 982(b)) for the filing of third-party petitions.

     C.     By separate order, and pursuant to Fed. R. Crim. P. 32.2, a forfeiture

money judgment in the amount of $5,813,584 will be entered in favor of the United

States against Defendants Larry L. Masino and Dixie L. Masino, to be imposed

jointly and severally, which shall be made part of the sentence of the Defendants and

included in the judgment.

CASE NO. 3:16cr17-MCR

D.    The Court shall retain jurisdiction to enforce and amend this Order, as necessary, pursuant to Fed. R. Crim. P. 32.2(e).

**DONE AND ORDERED** this 5th day of March 2019.


*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**